1999-NMSC-023

980 P.2d 641

**HASSE CONTRACTING COMPANY, INC., Plaintiff–Counterdefendant–Respondent,**

v.

**KBK FINANCIAL, INC., Defendant–Counterclaimant–Petitioner,**

and

**Gosney & Sons, Inc., Defendant–Counterclaimant–Respondent.**

No. 24,790.

Supreme Court of New Mexico.

April 26, 1999.

Gordon S. Little, P.A., Gordon S. Little, Albuquerque, for Petitioner.

Guebert & Yeomans, P.C., Richard D. Yeomans, Albuquerque, Miller, Stratvert & Torgerson, P.A., Lyman G. Sandy, Alice Tomlinson Lorenz, Albuquerque, for Respondents.

*OPINION*

FRANCHINI, Justice.

{1} In this interpleader action, a subcontractor on a state highway construction project deposited with the district court a sum of money that is claimed by both a financing company and a materials supplier on the project. The district court determined that the supplier was entitled to the money. The Court of Appeals affirmed, adopting an apparently unqualified public policy preference for suppliers over other creditors, including secured creditors. *See Hasse Contracting Co. v. KBK Fin., Inc.,* 1998–NMCA–038, ¶¶ 27–33, 125 N.M. 17, 956 P.2d 816. Because we conclude that the Legislature has declined to give suppliers absolute priority over secured creditors, we do not agree with the Court of Appeals' rationale. For the reasons discussed herein, however, we agree with the Court of Appeals' conclusion affirming the district court's grant of summary judgment in favor of the supplier.

*FACTS AND PROCEDURAL POSTURE*

{2} On February 14, 1994, Hilfiker Systems, Inc. entered into a factoring agreement with another Texas corporation, KBK Financial, Inc. In the agreement, Hilfiker expressly granted KBK a security interest in "its inventory, *accounts and contract rights* and proceeds therefrom." (Emphasis added.) The parties agreed that KBK's security interest included accounts and contract rights "that may hereafter arise or be acquired" by Hilfiker. The agreement further provided that "[t]ermination of this Agreement shall not affect the rights and obligations of the parties accruing with respect to prior transactions." KBK recorded its security interest by filing a financing statement with the Texas secretary of state on February 22, 1994.

{3} In June 1994, Hilfiker signed a contract with Hasse Contracting Company, Inc., a New Mexico corporation. Under the contract, Hilfiker agreed to supply precast concrete panels for a state highway construction project in San Juan County, New Mexico. A purchase order sent by Hasse to Hilfiker embodied the terms of the contract. The contract contained an anti-assignment clause. Additionally, the contract expressly stated that the "conditions and provisions of the general contract for which the material covered hereby is to be supplied are incorporated herein by reference and made a part hereof as fully as if written herein."

{4} The general contract referenced by the above language had been let by the state to Corn Construction Company, which is not a party to this lawsuit. By law, a condition of the general contract bound Corn and its subcontractors on the project to "make prompt payment to their subcontractors and suppliers." NMSA 1978, § 13–4–28 (1985). Furthermore, pursuant to the Little Miller Act, NMSA 1978, §§ 13–4–18 to 13–4–20 (1923, as amended through 1987), the contract obliged Corn to post a payment bond to protect any unpaid "person, firm or corporation who has furnished labor or material in

the prosecution of work provided for in such contract." Section 13–4–19(A).

{ 5} Corn subcontracted much of the concrete work on the project to Hasse, with the proviso that Hasse would indemnify Corn if Corn had to pay claims against the payment bond by any of Hasse's suppliers. As we have said, Hasse then sought a supply of precast concrete panels from Hilfiker. Hilfiker, in turn, arranged for Gosney & Sons, Inc., a Colorado corporation, to cast the panels and to deliver them to the job site, which was in northwestern New Mexico. Gosney cast the panels and delivered them to Hasse at the job site over a period between mid-January 1994 and early February 1995. During one of its deliveries, on January 26, 1995, Gosney presented Hasse with a bill for the panels. Upon learning that the deliveries were complete, Hilfiker also sent Hasse an invoice for the panels (Invoice No. 0366) on February 14, 1995.

{ 6} In the midst of Gosney's delivery of the concrete panels, on or about February 1, 1995, KBK notified Hilfiker that it was terminating the factoring agreement, effective 30 days later as provided in the agreement. On March 10, 1995, Hilfiker specifically assigned Invoice No. 0366 to KBK. On March 15, 1995, KBK notified Hasse that payment of the invoice should be mailed to it and not Hilfiker. Later in March, Hilfiker filed for bankruptcy, and Hilfiker's trustee in bankruptcy subsequently abandoned any interest Hilfiker might have had in Invoice No. 0366.

{ 7} On April 19, 1995, Gosney notified Corn of its intent to make a claim against the payment bond unless it was otherwise paid for supplying the concrete panels. From the record, it does not appear that Hasse was made aware of this demand, which if paid from the payment bond would arguably have triggered Hasse's liability to Corn for indemnification. Hasse, however, was already faced with Gosney's bill, Hilfiker's invoice, and KBK's claim for payment for the concrete panels, and consequently Hasse filed this interpleader action in the district court, naming Gosney and KBK as parties and depositing $49,004.58 with the clerk of the court. Eventually, Hasse, Gosney, and KBK each moved for summary judgment.

{ 8} Following a hearing, the district court resolved the competing motions by awarding Gosney "all proceeds and interest deposited in or held in the Court Registry in full payment of all its claims in this action." The district court was not required to detail the basis for its decision, and it did not do so. See Rule 1–052(B)(1)(a) NMRA 1999. KBK appealed, and the Court of Appeals upheld the district court, furnishing in the process a rationale for the district court's decision. We granted certiorari to review that rationale and, in so doing, we also necessarily evaluate whether the district court's decision was legally correct.

## DISCUSSION

### Standard Of Review And Applicable Law

{ 9} Summary judgment is appropriate when, as here, the parties do not dispute the facts, but only the legal effect of those facts. See Gardner–Zemke Co. v. State, 109 N.M. 729, 732, 790 P.2d 1010, 1013 (1990). In such cases, the district court determines as a matter of law which movant is entitled to summary judgment. See id. Appellate courts review matters of law de novo. See Self v. United Parcel Serv., Inc., 1998–NMSC–046, ¶ 6, 126 N.M. 396, 970 P.2d 582 (applying de novo standard to review of summary judgment "where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law").

{ 10} KBK, relying on Orcutt v. S & L Paint Contractors, Ltd., 109 N.M. 796, 798, 791 P.2d 71, 73 (Ct.App.1990), argues that Texas law governs the Hasse–Hilfiker contract because it was executed at Hilfiker's headquarters in Hurst, Texas. However, since the relevant provisions of New Mexico law were incorporated into the contract by reference, it makes no difference whether the law of contracts of Texas or New Mexico controls. With regard to the secured transactions aspects of this case, we apply New Mexico law instead of Texas law because KBK concedes that "the result would be the same under either state['s] law."

### Whether Suppliers Are Always Favored Over Other Creditors

{ 11} The Court of Appeals, in affirming the district court's grant of summary

judgment, relied heavily on the materialmen's lien statute, NMSA 1978, § 48–2–2 (1973). *See Hasse Contracting Co.,* 1998–NMCA–038, ¶¶ 27–33, 125 N.M. 17, 956 P.2d 816. The Court perceived in the statute a general "public policy preference for materialmen." *Id.* ¶ 33. The Court "recognize[d] that Section 48–2–2 does not apply to this case directly because this was a public works project, and public property cannot be subjected to a materialmen's lien under Section 48–2–2." *Id.* ¶ 29. However, since the project was covered by a Little Miller Act payment bond, and since the public policy behind the Little Miller Act is to provide protection for suppliers in the public contracts arena similar to the statutory materialmen's lien, *see State ex rel. W.M. Carroll & Co. v. K.L. House Constr. Co.,* 99 N.M. 186, 187–88, 656 P.2d 236, 237–38 (1982), the Court of Appeals reasoned that suppliers on public and private projects should be treated the same "for purposes of determining their priority to retained funds intended to be used to pay project costs." *Hasse Contracting Co.,* 1998–NMCA–038, ¶ 29, 125 N.M. 17, 956 P.2d 816. Applying this reasoning to this case and reaching a result in favor of Gosney over KBK, the Court of Appeals appears to have assumed that Section 48–2–2 establishes absolute priority in suppliers on private construction projects against other creditors. It does not.

{ 12} A lien under Section 48–2–2 is subjugated by statute to encumbrances that have attached prior "to the time when the building, improvement[,] or structure was commenced, work done[,] or materials were commenced to be furnished." NMSA 1978, § 48–2–5(A) (1991). A supplier takes free of such an encumbrance only if it was unrecorded and he or she had no notice of it. *See id.* The Legislature has further restricted the materialmen's lien statute in that liens thereunder of more than $5,000.00 must be perfected before the materialman enjoys protection. *See* 48–2–2.1(B) (1993). These provisions indicate that timing and actual or constructive notice—not a general public policy favoring materialmen—are the principal considerations in determining priority between suppliers and other creditors, at least in the context of private construction projects. *See* NMSA 1978, § 55–9–310 (1961) (articulating a preference for liens arising by operation of law over perfected security interests, *"unless the lien is statutory and the statute expressly provides otherwise"*) (emphasis added). The Court of Appeals did not analyze these considerations as they might apply to the parties in this case, and therefore we hold that its reliance on the materialmen's lien statute as support for the district court's decision in favor of Gosney is misplaced.

{ 13} While the above considerations of timing and notice might be as useful in ascertaining priority between suppliers and other creditors in public construction projects as they are in private ones, we do not rely on them here. Here, other reasons persuade us that the district court correctly determined that Gosney was entitled to the funds interpled by Hasse. Hasse had valid defenses against payment to KBK, and though it may also have had valid defenses against payment to Gosney, it never asserted them.

{ 14} NMSA 1978, § 55–9–318(1) (1985) allows certain defenses to account debtors like Hasse against assignees such as KBK and Gosney. Specifically, Section 55–9–318(1) states that

the rights of an assignee are subject to:

(a) all the terms of the contract between the account debtor and assignor and any defense arising therefrom; and

(b) any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives notification of the assignment.

In plain language, Subsection (a) provides that Hasse need not pay KBK or Gosney if it has valid contract defenses against either, and Subsection (b) permits Hasse to set off earlier-arising claims for payment against later ones.

*Whether Hasse's § 55–9–318(1) Defenses Against KBK Are Effective*

■ { 15} Hasse and Gosney (Respondents) argue that Hasse has three defenses under § 55–9–318(1) against payment to KBK. KBK, as a preliminary matter, contends that Gosney "has no standing" to as-

sert arguments on behalf of Hasse. Gosney, however, has an interest in showing that it, not KBK, is entitled to the interpled funds. Therefore, we hold that this contention is without merit.

{16} Respondents' first defense against payment to KBK is that Hilfiker breached its contract with Hasse by assigning its right to payment to KBK in violation of the anti-assignment clause in the Hasse–Hilfiker contract for the concrete panels. The effectiveness of this defense turns to a large degree on whether KBK is a secured party because NMSA 1978, § 55–9–318(4) (1985) nullifies any anti-assignment clause to the extent it seeks to prevent creation of a security interest in an assignor's collateral. *See id.* cmt. 4 (noting "economic need" as the basis for this legal rule, given that "accounts and other rights under contracts have become the collateral which secures an ever increasing number of financing transactions").

{17} The Court of Appeals held that KBK was a secured party against whom the anti-assignment clause was a nullity. *See Hasse Contraction Co.*, 1998–NMCA–038, ¶¶ 15–19, 125 N.M. 17, 956 P.2d 816. The Court of Appeals, however, did not determine when construction began on the state highway project, as it should have done in relying on the materialmen's lien statute for the framework of its analysis. Under the materialmen's lien statute, if work on the highway project began before KBK's interest in Hilfiker's accounts attached, KBK's secured status would not give it preference over suppliers on the project. *See* § 55–9–310; § 48–2–2; *Pioneer Savings & Trust, F.A. v. Rue*, 109 N.M. 228, 229, 784 P.2d 415, 416 (1989) ("A subcontractor's lien relates back to the date when any construction actually commenced, even though that subcontractor's work commenced after the [competing encumbrance] was recorded.").

{18} We are unable to determine from the record when construction on the state highway project began, which is one reason we decline to decide whether the priority rules supplied by the materialmen's lien statute apply to this case. Another reason is that the Legislature has not specified that those priority rules apply to a dispute involving a public works project. In any event, instead of remanding to the district court for a determination of relevant dates and other similar facts, it is much easier for us simply to evaluate Hasse's other defenses against payment to KBK, neither of which the Court of Appeals reached. We now turn to those arguments.

■ {19} Respondents' second defense against payment by Hasse to KBK is that Section 13–4–28 sets up a process to ensure prompt payment on public works projects, which Hilfiker violated by not paying Gosney. Section 13–4–28 requires that "contractors and subcontractors make prompt payment to their subcontractors and suppliers for amounts due and owing within seven days after receipt of payment from the [state's] central purchasing office or the contractor or subcontractor." Because this language is incorporated by reference in the Hasse–Hilfiker contract, Respondents argue that Hilfiker's failure to pay Gosney is a breach of the contract and a defense to payment to KBK under Section 55–9–318(1)(a). We are persuaded by this argument.

■ {20} KBK contends that Gosney is merely a sub-supplier to Hilfiker and that the language of Section 13–4–28 only requires prompt payment to subcontractors and suppliers, not sub-suppliers. We see no reason to adopt such a restrictive interpretation of the statute. In fact, in 1995, the Legislature amended Section 13–4–28, specifying: "These payment provisions apply to all tiers of contractors, subcontractors and suppliers." Although this amendment was made after the Hasse–Hilfiker contract was executed, we think that, instead of representing a change in the applicability of the statute, it clarifies that the Legislature always intended that all parties on a public works project be paid as expeditiously as possible under the process provided for in Section 13–4–28.

■ {21} We are aware that the language of Section 13–4–28 requires only that suppliers be paid "within seven days of receipt of payment" from the preceding party in the chain of payment. Here, Hasse interpled the monies owed for the concrete panels

instead of paying Hilfiker. Thus, it could be argued that Hilfiker's obligation to pay Gosney has not yet arisen under the statute, meaning that Hilfiker is not in breach of its contract with Hasse. However, the fact that Hilfiker has declared bankruptcy and its trustee has disclaimed any interest in being paid for the concrete panels makes it apparent that Gosney will never be paid by Hilfiker. Under these circumstances, we hold that Section 13–4–28, as incorporated in the Hasse–Hilfiker contract, provides an adequate basis for Hasse to refuse to pay Hilfiker or KBK and instead pay Gosney.

{ 22} Additionally, Respondents assert a third defense against payment to KBK, contending that Hasse has a claim of setoff under Section 55–9–318(1)(b). The key provision of Section 55–3–318(1)(b) is that a setoff claim must "accrue[ ] before the account debtor receives notification of the assignment." Gosney's claim accrued either on January 26, 1995 when it presented Hasse with a bill for the concrete panels or, at the latest, in early February 1995 when it completed delivery of the panels to Hasse. KBK did not notify Hasse of its security interest in Hilfiker's accounts or Hilfiker's specific assignment to it of Invoice No. 0366 until March 1995. Based on this chronology, we hold that Hasse's setoff defense is effective.

*Whether Gosney Is Entitled To The Interpled Funds*

{ 23} KBK insists that Gosney should not be paid from the interpled funds because, in its view, the payment bond required by the Little Miller Act adequately protects suppliers like Gosney. In other words, KBK would have the payment bond be a supplier's exclusive remedy. There is no support in the act or at common law for this view, and we therefore reject it. *Cf.* NMSA 1978, § 48–2–16 (1953) (stating that statutory provision for materialmen's lien does not preclude a personal action by a supplier for debt); *United States ex rel. Sunworks Div. of Sun Collector Corp. v. Insurance Co. of N. Am.,* 695 F.2d 455, 457 (10th Cir.1982) (holding that existence of materialmen's lien remedy does not exclude a common-law quantum meruit claim).

{ 24} Finally, while it appears that Hasse might have been able to assert the anti-assignment clause against Gosney since Section 55–9–318(4) does not destroy the clause with respect to non-secured parties such as Gosney, Hasse has never argued that Hilfiker should not have delegated its work to Gosney. Instead, Hasse has always insisted that Gosney should be paid for the casting and delivery of the concrete panels because Gosney actually did the work and Hasse was satisfied with the work. Given that Hasse's defenses against KBK are effective and Hasse has waived any defenses it might have had against Gosney, Gosney is entitled to the interpled funds.

*CONCLUSION*

{ 25} We affirm the decision of the Court of Appeals upholding the district court's award of summary judgment in favor of Gosney. As we have discussed, however, we do so for different reasons than those relied on by the Court of Appeals.

{ 26} **IT IS SO ORDERED.**

MINZNER, C.J., and BACA, J., concur.